UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

CARLTON XAVIER MATHEWS,

        Plaintiff,

v.                       Case No. 3:16-cv-579-J-20JRK

OFFICER J. WETHERBEE, et al.,

        Defendants.

_____

## ORDER

### I.   Status

Plaintiff claims Defendants used excessive force on him when he was a pretrial detainee at the Duval County Jail.[1] He also contends that Defendants retaliated against him with respect to his housing placement and conditions of confinement, as well as denied him access to courts and due process. Defendants have moved for summary judgment. See Defendants' Motion for Summary Judgment (Doc. 103) (Motion); Notice of Filing Documents in Support of Motion for Summary Judgment (Doc. 104). Plaintiff was previously advised of the provisions of Federal Rule of Civil Procedure 56, and that the granting of a motion for summary judgment would result in the termination of this case. See Order (Doc. 9). Plaintiff

---

[1]   Plaintiff is now a prisoner in the Florida Department of Corrections.

filed a response with exhibits. See Plaintiff's Response to Defendants' Motion for Summary Judgment (Doc. 112) (Response); Exhibits (Docs. 112-1 to 112-16). He also filed an Affidavit (Doc. 116) with exhibits (Doc. 116-1). The Motion is ripe for review.

## II.  Plaintiff's Amended Complaint

On August 13, 2015, Plaintiff was placed in administrative confinement "for excessive" disciplinary reports. Doc. 21 at 8. On administrative confinement, inmates are locked down for twenty-three hours per day, and they have "one hour out for leisure, shower, or phones." Id. "As a result of [Plaintiff] receiving to[o] many [disciplinary reports, he] served 4 of 22 months . . . locked on [disciplinary confinement]." Id. On disciplinary confinement, inmates are locked down twenty-three hours per day, but they do not get any phone privileges, commissary, or books. Id. When Plaintiff's time on disciplinary confinement was completed, he was placed back on administrative confinement, "when most inmates went straight back to general population. Meanwhile, [he] ha[s] been brutally attack[ed] . . . two times on . . . two different occasion[s] by the officers." Id.

The first "attack" was on December 23, 2015, and it forms the basis of Plaintiff's excessive force claims in this case. See id. On that day, Defendant Coulter approached Plaintiff's cell and advised him that he received a copy of the employee complaint

2

Plaintiff had written about all three Defendants. Id. at 2. About one hour later, Plaintiff was "sh*t bombed" by another inmate who was a gang member, but that inmate told Defendant Wetherbee that Plaintiff had tried to "sh*t bomb him." Id. at 2; see id. at 8. Defendant Wetherbee came into the dormitory to investigate, and all the gang-member inmates were blaming Plaintiff and encouraging the officers to "'spray his azz.'" Id. at 2. Prior to this incident, Plaintiff had complained about the gang members "teaming up on [him], and sh*t bombing [his] cell, and trying to get [him] sprayed and beat up by the Officers." Id. He also requested that he "be moved immediately." Id. Defendant Wetherbee came to Plaintiff's cell, "gave [him] a dirty look and walked back into the control station." Id. "Thereafter, Bio came and cleaned up the feces and Bio left. Then [Plaintiff] hear[d] the same [gang member] that sh*t bombed [him] say through the vent, 'u better get ready f*ckboy,' 'cuz em' cowboyz bout to come beat your azz.'" Id. Simultaneously, Plaintiff saw Defendants Wetherbee, Coulter, and Brabston along with other officers "putting on black gloves, and heading out [of] the booth into the dorm where [Plaintiff] was" housed. Id. Plaintiff thought the officers were "coming to shake [his] cell down looking for a sh*t bomb." Id. Defendant Wetherbee opened Plaintiff's food flap and instructed Plaintiff to give him the "sh*t bomb." Id. at 3. Before Plaintiff could "explain

3

[him]self or do anything, [Defendant Wetherbee] had pulled out his pepper gas and sprayed [Plaintiff] through [his] food flap." Id. Plaintiff was "temporarily blinded," but he heard Defendant Wetherbee direct that Plaintiff's cell door be opened. Id. At that time, Plaintiff was "blind and [couldn't] see and [was] gasping for air." Id. When his cell door opened, "all the Officers [were] screaming, 'get on the ground.'" Id. Plaintiff "quickly complied with the officers['] order and got on the ground on [his] stomach." Id. He then heard the officers yelling, "'stop resisting,' [while] they [were] all punching and kicking [Plaintiff] in [the] face and rib cage." Id. One of the officers "delivered the fatal blow with his handcuff[]s that knocked [Plaintiff] unconscious." Id. That punch "busted [Plaintiff's] head open, and when [he] awoke [he] was in the restraint[] chair and Nurse Smith was washing out [his] eyes." Id. Plaintiff was transported to Shands Hospital where he "received stitches for [his] injury." Id.

The second "attack" was approximately one year later, on December 5, 2016. Id. at 8. Plaintiff states that he "was brutally attacked by approximately 5 or 6 officers" who are not named as defendants in this case. Id.

On December 12, 2016, Defendant Coulter came to Plaintiff's cell and stated, "'I got your little letter you wrote the Feds.'"

Id. at 4.[2] Later that evening, Defendant Coulter approached Plaintiff's cell and asked what he needed to talk to him about. Id. Plaintiff responded that he needed Defendant Coulter to call the property room about Plaintiff's in-cell property. Id. The following day, Defendant Coulter approached Plaintiff's cell and "stated something and walked off." Id. at 5. Later that evening, Plaintiff asked Defendant Coulter whether he could be moved to a different dormitory, and Defendant Coulter said something "disparag[ing] and incoherent to the point w[h]ere [Plaintiff] could barely understand what he was saying, but [he] did catch the" part where Coulter said, "'for your millions dollars you asked the courts for.'" Id.

The following morning, Defendant Coulter and Officer Fisette observed Plaintiff in his boxer shorts with no shirt attempting to collect his mail. Id. Several hours later, Plaintiff was told to pack up because he was moving. Id. Apparently, Defendant Coulter directed that Plaintiff be moved to I-Block (isolation). Id. As Plaintiff was stepping into the elevator, Defendant Coulter told him to "'have fun'" and stated, "'I'll see you in hell.'" Id. Plaintiff claims that he was moved to I-Block for no reason and was placed on one-officer control. Id. at 6.

---

[2]   Defendant Coulter was served with process in this case on December 8, 2016. See Doc. 10.

When housed on I-Block, inmates are placed in a one-person cell and they are locked down 24 hours per day. Id. at 5-6. There is a shower inside each cell, and "you don't come out [un]less you [are] going to court or medical and etc. Sometimes if you get lucky you may get a[n] hour recreation out [of] your cell." Id. One-officer control means that every time an inmate exits his cell, he is placed in full restraints and escorted by at least one officer. Id. at 6. "Not all inmates that [are] in I-block . . . have to come out in full restraint[s], but [Plaintiff did]." Id. Depending on the escorting officer, the officer may handcuff and shackle Plaintiff for him to go to the recreation field, but Plaintiff never saw another I-Block inmate go to recreation in full restraints. Id.

Plaintiff stayed in I-Block for four or five days and then was moved back to the sixth floor where he had been housed previously. Id. Plaintiff remained there for two or three days, before Defendant Coulter came and moved him back to I-Block. Id.

On February 23, 2017, Plaintiff was moved to I-Block on the fifth floor, where the phone does not work. Id. at 8. He wrote several grievances about the issue, but nothing was done. Id. "[T]his deprives [him] of the rights to talk to [his] family, investigator, lawyers, and etc." Id.

6

Plaintiff wrote numerous grievances about being housed on I-Block and under one-officer control. Id. at 7. He was told that it was for his own safety. Id. On March 22, 2017, he submitted an employee complaint about how his Eighth Amendment rights were being violated, and he was being retaliated against for exercising his constitutional rights. Id. He advised that he would be filing more civil rights lawsuits. Id. Five or six hours later, he was moved from I-Block back to the sixth floor. Id. He was only given five minutes or less to pack, which Plaintiff states was an "indirect threat[]." Id. That evening (March 23, 2017), he was moved again. Id. at 7-8.

On March 28, 2017, Plaintiff looked out of his I-Block cell window and asked Sergeant Benoit why they would not let Plaintiff out of isolation. Id. at 9. Sergeant Benoit responded, "'to keep you safe from guys like me.'" Id. Plaintiff believes that Defendant Coulter directed that he be left on I-Block. Id. He claims that since he filed this lawsuit, "officer[s] are just retaliating against [him]." Id. He asserts that I-Block is worse than administrative confinement, id., and he desires to be out of lockdown so he is "able to attend the law library more often to fight [his] criminal case," id. at 10. He claims that he only receives two hours per week in the law library, "which is a

violation of [his] . . . First Amendment [right] to have access to the court." Id.

Plaintiff also complains that on January 19, 2017, an officer "claim[ed] to have found a pill" that was prescribed to Plaintiff. Id. at 10. "As a result, the psychiatrist put a crush and float order." Id. Plaintiff "experience[s] chest pains and heartburn" from taking his medication in that manner. Id.

### III. Defendants' Motion

Defendants seek entry of summary judgment in their favor because the force used against Plaintiff was objectively reasonable; Plaintiff cannot prevail on his retaliation claim; he has failed to prove an access to courts violation; and he has failed to state a due process claim or any claim against Defendants with respect to his medications. In support of their position, Defendants filed a copy of Plaintiff's deposition; a Contact Log Report for Plaintiff's time in the Jail; the deposition transcript of Davita Smith, LPN, former employee of the Jacksonville Sheriff's Office; the deposition transcript of Jessica Sabin, a physician's assistant who treated Plaintiff at Shands hospital after the alleged use of excessive force; the deposition transcript of Win Tate, a nurse practitioner who worked at the Jail; and Plaintiff's responses to Defendants' requests for admissions, which includes Plaintiff's medical records.

## IV.  Plaintiff's Response

Plaintiff contends that as a result of Defendants' excessive force, he received a "very serious injury that required for [him] to be sent to Shands Hospital." Doc. 112 at 1. According to Plaintiff, he states that the head injury he received "has caused many mental mood swings and (absent) proper treatment [he] will continue to suffer from this mental handicap." Id. at 2. He states that he has received multiple disciplinary reports as a result of the trauma he suffered. Id. He contends that the medical records prove Defendants violated his constitutional rights by using excessive force on him for no reason. See id. at 1-2.

As to Defendants' assertion that Plaintiff's story has changed over time, he claims that he "has strengthened his claim by being straightforward in deposition," and that he has not admitted to any inconsistencies among his complaint, sworn statements, and deposition. Id. at 3. As to the pepper spraying, he states that "[e]ven if [P]laintiff did refuse [Defendant] Wetherbee['s] verbal order, this still do[es not] justify [Defendant] Wetherbee to immediately pepper spray" him. Id. at 5. He goes on further to describe the incidents as he did in his Amended Complaint.

## V.    Summary Judgment Standard

"'Summary judgment is appropriate where there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law.'" Hinkle v. Midland Credit Mgmt., Inc., 827 F.3d 1295, 1300 (11th Cir. 2016) (quoting Jurich v. Compass Marine, Inc., 764 F.3d 1302, 1304 (11th Cir. 2014)); see Fed. R. Civ. P. 56(a). "A genuine issue of material fact exists when the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Bowen v. Manheim Remarketing, Inc., 882 F.3d 1358, 1362 (11th Cir. 2018) (quotations and citation omitted); see Hornsby-Culpepper v. Ware, 906 F.3d 1302, 1311 (11th Cir. 2018) ("Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." (quotations and citation omitted)). In considering a summary judgment motion, the Court views "the evidence and all reasonable inferences drawn from it in the light most favorable to the nonmoving party." Hornsby-Culpepper, 906 F.3d at 1311 (quotations and citation omitted).

"[W]hen the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986) (footnote and citation omitted); see Winborn v. Supreme Beverage

Co. Inc., 572 F. App'x 672, 674 (11th Cir. 2014) (per curiam) ("If the movant satisfies the burden of production showing that there is no genuine issue of fact, 'the nonmoving party must present evidence beyond the pleadings showing that a reasonable jury could find in its favor.'" (quoting Shiver v. Chertoff, 549 F.3d 1342, 1343 (11th Cir. 2008)). "A 'mere scintilla' of evidence supporting the opposing party's position will not suffice; there must be enough of a showing that the jury could reasonably find for that party." Loren v. Sasser, 309 F.3d 1296, 1302 (11th Cir. 2002) (quoting Walker v. Darby, 911 F.2d 1573, 1577 (11th Cir. 1990) (internal quotations omitted)).

### VI.  Analysis[3]

### A.  Excessive Force

For a pretrial detainee to establish a viable excessive force claim, he must show that the use of force was "objectively unreasonable." Kingsley v. Hendrickson, 135 S. Ct. 2466, 2473 (2015) ("[A] pretrial detainee must show only that the force purposely or knowingly used against him was objectively unreasonable.").

> [O]bjective reasonableness turns on the "facts and circumstances of each particular case."

---

[3] For purposes of summary judgment, the Court views the evidence and all reasonable inferences therefrom in the light most favorable to Plaintiff. Thus, the facts relied on in the Court's analysis may differ from those that can be ultimately proven.

> Graham v. Connor, 490 U.S. 386, 396 (1989). A court must make this determination from the perspective of a reasonable officer on the scene, including what the officer knew at the time, not with the 20/20 vision of hindsight. See ibid. A court must also account for the "legitimate interests that stem from [the government's] need to manage the facility in which the individual is detained," appropriately deferring to "policies and practices that in th[e] judgment" of jail officials "are needed to preserve internal order and discipline and to maintain institutional security." Bell v. Wolfish, 441 U.S. 520, 540, 547(1979).

Kingsley, 135 S. Ct. at 2473 (internal citations modified); see Piazza v. Jefferson Cty., Ala., 923 F.3d 947, 953 (11th Cir. 2019). Courts recognize that "officers facing disturbances are often forced to make split-second judgments about the need for such force in circumstances that are tense, uncertain, and rapidly evolving." Piazza, 923 F.3d at 953 (quotations and citation omitted).

The Supreme Court has identified a non-exclusive list of factors that "may bear on the reasonableness or unreasonableness of the force used:"

> the relationship between the need for the use of force and the amount of force used; the extent of the plaintiff's injury; any effort made by the officer to temper or to limit the amount of force; the severity of the security problem at issue; the threat reasonably perceived by the officer; and whether the plaintiff was actively resisting. See, e.g., Graham, 490 U.S. at 396.

Kingsley, 135 S. Ct. at 2473 (internal citations modified).

12

There is no dispute that on December 23, 2015, Plaintiff and other inmates were "throwing sh*t" at each other. Doc. 104-1 at 46, 56-57. They created an unsanitary and potentially dangerous situation that required biohazard cleanup. See Doc. 104-1 at 48 ("Sh*t was everywhere in the hallway, all outside the door, everywhere."); see also Doc. 21 at 2. After it was cleaned up, Defendant Wetherbee approached Plaintiff's cell, opened the food flap, and said something to the effect of, "where is the sh*t bomb?" Doc. 104-1 at 50, 82; see Doc. 21 at 3. In his Amended Complaint and Response, Plaintiff states that before he could explain or do anything, Wetherbee sprayed him through the food flap. Doc. 21 at 3; Doc. 112 at 7 ("Before I had a chance to explain myself or do anything, Officer J. Wetherbee pepper sprayed me through my food flap within seconds after asking me for the sh*t (feces) bomb."). At deposition, Plaintiff stated that he initially "played stupid," and responded, "what sh*t bomb, man?", but before he could say anything else, Defendant Wetherbee sprayed him with chemical agents through the food flap on his cell door. Doc. 104-1 at 50, 80-81. Plaintiff was not standing at the door; rather, he was standing close to the toilet in his cell, but he claims the spray "[h]it [him] right in the face." Id. at 81, 83.

Plaintiff was "blinded" by the chemical agents, but he heard Defendant Wetherbee direct that Plaintiff's cell door be opened.

13

Doc. 21 at 3; see Doc. 104-1 at 50, 52. According to Plaintiff, officers were yelling at him to get on the ground. Doc. 21 at 3; see Doc. 104-1 at 50-51. Plaintiff laid on the ground, albeit outside of his cell, in accordance with the officers' orders. Doc. 21 at 3; see Doc. 104-1 at 50-51, 83. Although he did as instructed, he was punched and kicked repeatedly. See Doc. 21 at 3; Doc. 104-1 at 83-84. On the other hand, Defendants argue that they "used objectively reasonable force that was necessary to maintain order and control [Plaintiff]." Motion at 17.[4]

Defendants' assertion that "[b]y [Plaintiff's] own admission, force had to be used to gain access to the waste bombs in his cell," Doc. 103 at 18, is contrary to Plaintiff's allegations. Plaintiff alleges that he was sprayed with chemical agents within seconds of being asked for the "sh*t bomb" and without being warned or afforded time to explain or do anything. See Doc. 21 at 3; Doc. 104-1 at 50, 80-82; Doc. 112 at 7. Plaintiff was not standing at the door, and under his facts, there is no indication that he was threatening the officers or causing a disturbance at that time.

Defendants also assert that Plaintiff "then failed to comply with the officers' commands to submit to handcuffing, keeping his

---

[4] Plaintiff filed part of the Response to Resistance Report (Doc. 112-12), which includes part of what appears to be Defendant Wetherbee's narrative statement about the incident.

hands by his face where they could not be placed in cuffs." Doc. 103 at 18. It is not entirely unreasonable to believe, considering Plaintiff's factual statements, that he complied with the orders to get on the ground and when the kicking and punching began, he attempted to protect his face with his hands. See Doc. 104-1 at 86 ("It happened so fast - - that right there, I probably - - most likely, I probably had my hands trying to - - trying to protect my face. But then, again, I'm not - - I'm not for certain - - 100 percent certain."); Doc. 112 at 3 ("[P]laintiff's hands were by his face to shield him from the officer's kicks and punches.").

Although the extent of Plaintiff's physical injury[5] weighs in favor of finding no constitutional violation, it is unclear on this record whether any force was necessary, let alone whether the amount of force used was reasonably related to the need for force, whether Plaintiff was afforded time to comply with Defendant Wetherbee's order, or whether he was disobeying orders and actively resisting.[6] While the discrepancies in Plaintiff's stories and the medical records cast doubt on Plaintiff's version of events, it is

---

[5] Plaintiff had a superficial laceration that was 1.5 centimeters long on his ear, which was treated with glue (not stitches). See Doc. 104-4 at 10-12, 18; Doc. 112-4 at 3-9.

[6] Plaintiff agreed at deposition that he was sprayed one time, Doc. 104-1 at 80-81, but the narrative report indicates two bursts of chemical agents were deployed into Plaintiff's cell, Doc. 112-12 at 5.

not the Court's job on summary judgment to weigh the evidence or make credibility determinations. See Sears v. Roberts, 922 F.3d 1199, 1208-09 (11th Cir. 2019). Considering the conflicting stories told by the parties, the Court finds that genuine issues of material fact preclude entry of summary judgment on the excessive force claims. Thus, Defendants' Motion is due to be denied to that extent.

This conclusion leads to a denial of Defendants' request for qualified immunity. "The qualified immunity defense shields 'government officials performing discretionary functions . . . from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" Corbitt v. Vickers, 929 F.3d 1304, 1311 (11th Cir. 2019) (quoting Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)). "To be entitled to qualified immunity, the defendant must first establish that he was acting within the scope of his discretionary authority." Gaines v. Wardynski, 871 F.3d 1203, 1208 (11th Cir. 2017) (citation omitted). If the defendant so shows, the burden shifts to the plaintiff to demonstrate that the defendant violated his constitutional rights and at the time of the violation, those rights were clearly established. Id.

Here, the material facts necessary to determine if the force used was objectively reasonable are in dispute. On the one hand, Plaintiff says he was immediately sprayed without being warned, given a chance to explain himself, or otherwise do anything, and excessive physical force was used against him when he was not resisting. While Plaintiff admitted at deposition that he still had a "sh*t bomb" in his cell[7] before he was sprayed and that he initially "played stupid," he has maintained his position that he was immediately sprayed without being afforded the chance to explain or do anything. He has also maintained that the punching and kicking was excessive and unjustified. On the other hand, Defendants claim that Plaintiff was sprayed for his failure to turn over a "sh*t bomb" that he had in his cell, and they used a reasonable amount of physical force against him to gain his compliance with their lawful commands.

"[I]f force used against a pretrial detainee is more severe than is necessary to subdue him or otherwise achieve a permissible governmental objective, it constitutes 'punishment' and is therefore unconstitutional." <u>Piazza</u>, 923 F.3d at 952. Even if a detainee is initially resisting, once he "'has <u>stopped resisting</u> there is no longer a need for force, so the use of force thereafter

---

[7]  Plaintiff acknowledged that he had a shampoo bottle filled with feces and "probably" some cups. Doc. 104-1 at 110-11.

is disproportionate to the need.'" Id. at 953 (quoting Danley v. Allen, 540 F.3d 1298, 1309 (11th Cir. 2008)).[8] On this record, if Plaintiff's version of the facts is believed, he was sprayed without warning and without being given time to comply and physically beaten for no reason. Such actions would be a violation of Plaintiff's clearly established rights. Thus, in light of the factual disputes, and the requirement on summary judgment that the Court view the facts in the light most favorable to Plaintiff, Defendants' Motion is due to be denied insofar as they seek qualified immunity on Plaintiff's excessive force claims.

**B.    Retaliation**

Plaintiff alleges that Defendant Coulter moved him to I-Block and placed him on one-officer control in retaliation for Plaintiff filing this lawsuit.

"'The First Amendment forbids prison officials from retaliating against prisoners for exercising the right of free speech.'" O'Bryant v. Finch, 637 F.3d 1207, 1212 (11th Cir. 2011) (per curiam) (quoting Farrow v. West, 320 F.3d 1235, 1248 (11th Cir. 2003)); see Thomas v. Evans, 880 F.2d 1235, 1242 (11th Cir. 1989) ("The gist of a retaliation claim is that a prisoner is penalized for exercising the right of free speech."). To prevail

---

[8]  Plaintiff acknowledged that he "can't refute" that the officers handcuffed him after their use of force. Doc. 104-1 at 155-56.

on a First Amendment retaliation claim, a plaintiff must show:
"(1) he engaged in constitutionally protected conduct; (2) the
defendant's retaliatory act adversely affected the protected
conduct; and (3) there is a causal connection between the
retaliatory act and the adverse effect on the conduct." Smith v.
Fla. Dep't of Corr., 713 F.3d 1059, 1063 (11th Cir. 2013) (citation
omitted). Regarding the second element, "[a] plaintiff suffers
adverse action if the defendant's allegedly retaliatory conduct
would likely deter a person of ordinary firmness from the exercise
of First Amendment rights." Ziegler v. Martin Cty. Sch. Dist., 831
F.3d 1309, 1328 (11th Cir. 2016) (quotations and citation omitted).
To show a sufficient causal connection, "the prisoner must show
that, as a subjective matter, a motivation for the defendant's
adverse action was the prisoner's grievance or lawsuit." Jemison
v. Wise, 386 F. App'x 961, 965 (11th Cir. 2010) (citing Smith v.
Mosley, 532 F.3d 1270, 1278 (11th Cir. 2008)). "Once the plaintiff
establishes that the protected conduct was a motivating factor
behind the harm, the burden of production shifts to the defendant.
The defendant can prevail on summary judgment if it can show it
would have taken the same action in the absence of the protected
activity." Smith, 713 F.3d at 1063 (citing Mosley, 532 F.3d at
1278).

Plaintiff's conclusory allegations, unsupported by any evidence, are insufficient to show that Defendant Coulter transferred him to I-Block and placed him on one-officer control in retaliation for filing this case. Plaintiff had previously complained about his safety and requested that he be moved. See Doc. 21 at 2, 5. Plaintiff's housing placement and conditions of confinement were modified in response to safety concerns. Indeed, Plaintiff alleged that he was told by Lieutenant Mitchell and Chief Calloway that he was in I-Block for his own safety. Id. at 7.[9] There is nothing in the record to support Plaintiff's assertions that he was moved to I-Block and placed on one-officer control in retaliation for filing this lawsuit. Thus, the Motion will be granted as to Plaintiff's retaliation claim.

## C.   Access to Courts

Plaintiff alleges that his lack of access to a phone and the library amounts to a denial of access to the courts.

---

[9]  The Contact Log Report shows that on January 9, 2017, Plaintiff was moved to I-Block per Chief Calloway. Doc. 104-2 at 12. An entry dated January 20, 2017, states: "Upon release from self harm status; inmate is to be moved to available I Block or lockdown per Sgt. Patterson and Sgt. P. Johnson." Id. On January 21, 2017, Plaintiff was removed from self harm status and returned back to administrative confinement. Id. "Per Sgt. Long, Inmate cannot be housed on 6 floor, therefore he will remain on 2nd floor in I-Block as adm[inistrative] confinement." Id.

Access to courts is a right grounded in several constitutional amendments, including the First, Fifth, and Fourteenth Amendments. Chappell v. Rich, 340 F.3d 1279, 1282 (11th Cir. 2003); see Barbour v. Haley, 471 F.3d 1222, 1224 n.2 (11th Cir. 2006) (noting that the prisoners' claim that they had been denied meaningful access to the courts implicated both the First and Fourteenth Amendments). To state an access-to-courts claim, a plaintiff must first establish an actual injury. Lewis v. Casey, 518 U.S. 343, 349-50 (1996); Barbour, 471 F.3d at 1225. "To allege an actual injury, the complaint 'must identify a nonfrivolous, arguable underlying claim.'" Alvarez v. Sec'y, Fla. Dep't of Corr., 646 F. App'x 858, 867 (11th Cir. 2016) (quoting Christopher v. Harbury, 536 U.S. 403, 415 (2002)). "More specifically, the complaint must describe the underlying claim 'well enough to apply the nonfrivolous test and to show that the arguable nature of the underlying claim is more than hope.'" Id. (quoting Cunningham v. Dist. Attorney's Office for Escambia Cty., 592 F.3d 1237, 1271 (11th Cir. 2010)). Additionally, the plaintiff must show that the underlying nonfrivolous legal claim was raised, or would have been raised, in connection with a direct appeal, a collateral attack on his conviction, or a civil rights action. Lewis, 518 U.S. at 354-57; Cranford v. Nevada Dep't of Corr., 398 F. App'x 540, 546-47 (11th Cir. 2010). "Impairment of any other litigating capacity is simply

21

one of the incidental (and perfectly constitutional) consequences of conviction and incarceration." Wilson v. Blankenship, 163 F.3d 1284, 1290 (11th Cir. 1998) (quotations and citation omitted).

Plaintiff has not shown an actual injury. The Motion is due to be granted as to his access-to-courts claim.

## D.  Due Process / Medication

To the extent Plaintiff raises a due process claim with respect to his conditions of confinement on I-Block or one-officer control, the claim will be dismissed. His allegations are conclusory. As this Court previously found, the conditions described in I-Block do not present an objectively substantial risk of serious harm or impose an atypical and significant hardship on Plaintiff in relation to the ordinary incidents of life in the Jail. See Order (Doc. 69) at 6-8 ("Plaintiff's placement in confinement on I-Block did not impose an atypical and significant hardship on Plaintiff in relation to the ordinary incidents of life in jail as a pretrial detainee. . . . The conditions described in I-Block do not impose a significant hardship within the pretrial detention correctional context; I-Block, as described by Plaintiff, does not present 'an objectively substantial risk of serious harm.'" (citation omitted)). The conditions imposed were reasonably related to the legitimate goals of safety and

institutional order, and there is no indication that the conditions were arbitrary or purposeless.

Moreover, Plaintiff does not claim that any of the named Defendants were involved in the order that required his medication be crushed and floated in a cup of water to ensure he took the medication as prescribed. Thus, no such claim can remain in this case.

## E.   Official Capacity Claims

Insofar as Plaintiff sues Defendants in their official capacities, such claims are the equivalent of a claim against the City of Jacksonville. See Busby v. City of Orlando, 931 F.2d 764, 776 (11th Cir. 1991) ("[W]hen an officer is sued under Section 1983 in his or her official capacity, the suit is simply another way of pleading an action against an entity of which an officer is an agent." (citations and internal quotations omitted)). Regardless, Plaintiff has neither pleaded nor proven any custom, policy, or practice that caused any alleged violation of his rights. Thus, Defendants are entitled to summary judgment in their favor as to all claims against them in their official capacities.

## F.   Injunctive Relief

All claims against Defendants for injunctive relief are due to be dismissed as moot, because Plaintiff is no longer housed at the Jail. See Zatler v. Wainwright, 802 F.2d 397, 399 (11th Cir.

1986) (per curiam). Rather, he is serving a life sentence in the Florida Department of Corrections.

Accordingly, it is

**ORDERED:**

1.  Defendants' Motion for Summary Judgment (Doc. 103) is **GRANTED in part and DENIED in part**.

   a. The Motion is **GRANTED to the extent** that judgment shall enter in favor of Defendants and against Plaintiff on Plaintiff's retaliation claim, access-to-courts claim, due process claim, any claim with respect to his medication, and all claims against Defendants in their official capacities. The Motion is further **GRANTED to the extent** that all claims for injunctive relief are **DISMISSED as moot**. Judgment to that effect is withheld pending adjudication of the action on the whole.

   b. Defendants' Motion is otherwise **DENIED**, and the case will proceed on Plaintiff's excessive force claims against Defendants in their individual capacities.

2.  By **September 30, 2019**, the parties shall confer in good faith in an attempt to settle the remaining claims. If the parties are able to resolve the case without further Court intervention,

24

they shall file the appropriate documents to close out the file. If the parties are unable to settle the claims, they shall file a notice by **October 15, 2019**, advising whether they believe a settlement conference before a United States Magistrate Judge would be beneficial.

3.   In the meantime and pending further Order, the Clerk shall **ADMINISTRATIVELY CLOSE** this case.

**DONE AND ORDERED** at Jacksonville, Florida, this _18th_ day of _September_, 2019.

_____
UNITED STATES DISTRICT JUDGE

JAX-3 8/28
c:
Carlton Xavier Mathews, #J27519
Sonya Harrell Hoener, Esquire
Sean Bryan Granat, Esquire