UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

CARLTON XAVIER MATHEWS,

       Plaintiff,

v.                                  Case No. 3:16-cv-579-HES-LLL

OFFICER J. WETHERBEE, et al.,

       Defendants.

_____

## ORDER

### I.   Status

On September 19, 2019, the Court granted in part and denied in part Defendants' motion for summary judgment. See Order (Doc. 117). The Court granted the motion, finding that Defendants are entitled to summary judgment in their favor on Plaintiff's retaliation claim, access-to-courts claim, due process claim, any claim with respect to his medication, and all claims against Defendants in their official capacities. The Court also granted the motion to the extent that it dismissed as moot all requests for injunctive relief. The Court, however, denied Defendants' request for qualified immunity on

Plaintiff's excessive force claims against Defendants in their individual capacities.

Defendants appealed the Court's denial of qualified immunity. <u>See</u> Notice of Appeal (Doc. 121). On December 31, 2020, the Eleventh Circuit issued an Opinion (Doc. 130) vacating this Court's denial of Defendants' motion for summary judgment on the basis of qualified immunity, and the Mandate (Doc. 131) issued on January 29, 2021. At this Court's direction, the parties filed supplemental briefs on the issue of Defendants' entitlement to qualified immunity. <u>See</u> Defendants' Supplemental Brief (Doc. 134); Plaintiff's Amended Supplemental Initial Brief (Doc. 137). Upon review, the Court grants in part and denies in part Defendants' request for qualified immunity on Plaintiff's excessive force claims.

## II.    Plaintiff's Amended Complaint[1]

On December 23, 2015, Plaintiff was a pretrial detainee at the Duval County Jail.[2] On that day, Defendant Coulter approached Plaintiff's cell and advised him that he received a copy of the employee complaint Plaintiff had written about all three Defendants. <u>Id.</u> at 2. About one hour later, Plaintiff was

---

[1] The Court's summary of Plaintiff's allegations focuses on the facts relating to the excessive force claims at issue.

[2] Plaintiff is now a prisoner in the Florida Department of Corrections.

2

"sh*t bombed"[3] by another inmate who was a gang member, but that inmate told Defendant Wetherbee that Plaintiff had tried to "sh*t bomb him." Id. at 2; see id. at 8. Defendant Wetherbee came into the dormitory to investigate, and all the gang-member inmates were blaming Plaintiff and encouraging the officers to "'spray his azz.'" Id. at 2. Prior to this incident, Plaintiff had complained about the gang members "teaming up on [him], and sh*t bombing [his] cell, and trying to get [him] sprayed and beat up by the Officers." Id. Plaintiff also requested that he "be moved immediately." Id. Defendant Wetherbee came to Plaintiff's cell, "gave [him] a dirty look and walked back into the control station." Id. "Thereafter, Bio came and cleaned up the feces and Bio left. Then [Plaintiff] hear[d] the same [gang member] that sh*t bombed [him] say through the vent, 'u better get ready f*ckboy,' 'cuz em' cowboyz bout to come beat your azz.'" Id. Simultaneously, Plaintiff saw Defendants Wetherbee, Coulter, and Brabston along with other officers "putting on black gloves, and heading out [of] the booth into the dorm where [Plaintiff] was" housed. Id. Plaintiff thought the officers were "coming to shake [his] cell down looking for a sh*t bomb." Id. Defendant Wetherbee opened Plaintiff's food flap and instructed Plaintiff to give him the "sh*t bomb." Id. at 3. Before Plaintiff

---

[3] A "sh*t bomb" is a bottle or other container filled with human waste. See Doc. 104-1 at 47, 58, 110-11.

could "explain [him]self or do anything, [Defendant Wetherbee] had pulled out his pepper gas and sprayed [Plaintiff] through [his] food flap." Id. Plaintiff was "temporarily blinded," but he heard Defendant Wetherbee direct that Plaintiff's cell door be opened. Id. At that time, Plaintiff was "blind and [couldn't] see and [was] gasping for air." Id. When his cell door opened, "all the Officers [were] screaming, 'get on the ground.'" Id. Plaintiff "quickly complied with the officers['] order and got on the ground on [his] stomach." Id. He then heard the officers yelling, "'stop resisting,' [while] they [were] all punching and kicking [Plaintiff] in [the] face and rib cage." Id. One of the officers "delivered the fatal blow with his handcuff[]s that knocked [Plaintiff] unconscious." Id. That punch "busted [Plaintiff's] head open, and when [he] awoke [he] was in the restraint[] chair and Nurse Smith was washing out [his] eyes." Id. Plaintiff was transported to Shands Hospital where he "received stitches for [his] injury." Id.

### III. Parties' Positions

#### a. Defendants' Position

Defendants argue they are entitled to qualified immunity on Plaintiff's excessive force claims. They contend there is no dispute that they were acting within the scope of their discretionary authority, and thus the burden shifts to Plaintiff to show that they violated his constitutional rights and those rights

were clearly established. According to Defendants, Plaintiff has failed to meet his burden. Defendants contend that they "used objectively reasonable force necessary to maintain order and control" Plaintiff. Doc. 134 at 13. They further contend that "there is no clearly established law that would prohibit the use of pepper spray on a detainee who refuses to turn over contraband" or to use "force to subdue an apparently uncooperative [Plaintiff] before placing him in handcuffs." Id. at 20.

Defendants also urge the Court to disregard Plaintiff's "testimony that was blatantly contradicted, fanciful, and admitted by him to be untruthful." Id. at 22 (emphasis omitted). According to Defendants, "[t]he medical evidence was not consistent with [Plaintiff] having been kicked or punched," and reviewing the entirety of the record, "no reasonable jury could believe that he was kicked and punched or that he received any injury other than a de minimis laceration by his ear." Id. at 22-23. Defendants also contend that "there is no record evidence regarding excessive force after the time of the pepper spray." Id. at 23. Moreover, Defendants argue the Court should disregard the statements in Plaintiff's operative complaint that conflict with his deposition testimony. Id. at 24. Finally, Defendants assert "the Court should disregard [Plaintiff's] statements to the extent that they do not present the perspective of the officers." Id. at 25.

### b. Plaintiff's Position

Plaintiff asserts he received a "very serious injury that required for [him] to be sent to Shands Hospital." Doc. 112 at 1. According to Plaintiff, he states that the head injury he received "has caused many mental mood swings and (absent) proper treatment [he] will continue to suffer from this mental handicap." Id. at 2. He states that he has received multiple disciplinary reports as a result of the trauma he suffered. Id. He contends that the medical records prove Defendants violated his constitutional rights by using excessive force on him for no reason. See id. at 1-2.

As to Defendants' assertion that Plaintiff's story has changed over time, Plaintiff claims that he "has strengthened his claim by being straightforward in deposition," and that he has not admitted to any inconsistencies among his complaint, sworn statements, and deposition. Id. at 3. As to the pepper spraying, he states that "[e]ven if [P]laintiff did refuse [Defendant] Wetherbee['s] verbal order, this still do[es not] [permit] [Defendant] Wetherbee to immediately pepper spray" him. Id. at 5. He goes on further to describe the incidents as he did in his Amended Complaint.

In his supplemental brief, Plaintiff contends that Defendants' counsel has provided inaccurate information to the Court. He asserts that he only received "approximate[ly] 22 disciplinary reports in a 3 1/2 year time span,"

6

rather than 30 as suggested by defense counsel. Doc. 137 at 1. He argues that Defendants "committed an aggravated battery on" him, id. at 5, violated Florida Model Jail Standards, id. at 7, and are not entitled to qualified immunity, id. at 5.

## IV.   Summary Judgment Standard

"'Summary judgment is appropriate where there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law.'" Hinkle v. Midland Credit Mgmt., Inc., 827 F.3d 1295, 1300 (11th Cir. 2016) (quoting Jurich v. Compass Marine, Inc., 764 F.3d 1302, 1304 (11th Cir. 2014)); see Fed. R. Civ. P. 56(a). "A genuine issue of material fact exists when the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Bowen v. Manheim Remarketing, Inc., 882 F.3d 1358, 1362 (11th Cir. 2018) (quotations and citation omitted); see Hornsby-Culpepper v. Ware, 906 F.3d 1302, 1311 (11th Cir. 2018) ("Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." (quotations and citation omitted)). In considering a summary judgment motion, the Court views "the evidence and all reasonable inferences drawn from it in the light most favorable to the nonmoving party." Hornsby-Culpepper, 906 F.3d at 1311 (quotations and citation omitted).

"[W]hen the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986) (footnote and citation omitted); see Winborn v. Supreme Beverage Co. Inc., 572 F. App'x 672, 674 (11th Cir. 2014) (per curiam) ("If the movant satisfies the burden of production showing that there is no genuine issue of fact, 'the nonmoving party must present evidence beyond the pleadings showing that a reasonable jury could find in its favor.'" (quoting Shiver v. Chertoff, 549 F.3d 1342, 1343 (11th Cir. 2008)). "A 'mere scintilla' of evidence supporting the opposing party's position will not suffice; there must be enough of a showing that the jury could reasonably find for that party." Loren v. Sasser, 309 F.3d 1296, 1302 (11th Cir. 2002) (quoting Walker v. Darby, 911 F.2d 1573, 1577 (11th Cir. 1990) (internal quotations omitted)).

## V.    Analysis[4]

"The qualified immunity defense shields 'government officials performing discretionary functions . . . from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional

---

[4] For purposes of summary judgment, the Court views the evidence and all reasonable inferences therefrom in the light most favorable to Plaintiff. Thus, the facts relied on in the Court's analysis may differ from those that can be ultimately proven.

rights of which a reasonable person would have known.'" <u>Corbitt v. Vickers</u>, 929 F.3d 1304, 1311 (11th Cir. 2019) (quoting <u>Harlow v. Fitzgerald</u>, 457 U.S. 800, 818 (1982)). "To be entitled to qualified immunity, the defendant must first establish that he was acting within the scope of his discretionary authority." <u>Gaines v. Wardynski</u>, 871 F.3d 1203, 1208 (11th Cir. 2017) (citation omitted). If the defendant so shows, the burden shifts to the plaintiff to demonstrate that the defendant violated his constitutional rights and at the time of the violation, those rights were clearly established. <u>Id.</u>

Here, there is no dispute that Defendants were acting in the scope of their discretionary authority. Thus, Plaintiff must demonstrate that Defendants violated his constitutional rights and at the time of the violation, those rights were clearly established.

For a pretrial detainee to establish an excessive force claim, he "must show only that the force purposely or knowingly used against him was objectively unreasonable." <u>Kingsley v. Hendrickson</u>, 135 S. Ct. 2466, 2473 (2015).

> [O]bjective reasonableness turns on the "facts and circumstances of each particular case." <u>Graham v. Connor</u>, 490 U.S. 386, 396 (1989). A court must make this determination from the perspective of a reasonable officer on the scene, including what the officer knew at the time, not with the 20/20 vision of hindsight. <u>See id.</u> A court must also account for the "legitimate interests that stem from [the

> government's] need to manage the facility in which the
> individual is detained," appropriately deferring to
> "policies and practices that in th[e] judgment" of jail
> officials "are needed to preserve internal order and
> discipline and to maintain institutional security." Bell
> v. Wolfish, 441 U.S. 520, 540, 547 (1979).

Id. (internal citations modified); see also Piazza v. Jefferson Cnty., Ala., 923

F.3d 947, 953 (11th Cir. 2019). Courts recognize that "officers facing

disturbances are often forced to make split-second judgments about the need

for such force in circumstances that are tense, uncertain, and rapidly evolving."

Piazza, 923 F.3d at 953 (quotations and citation omitted).

The Supreme Court has identified a non-exclusive list of factors that

"may bear on the reasonableness or unreasonableness of the force used:"

> the relationship between the need for the use of force
> and the amount of force used; the extent of the
> plaintiff's injury; any effort made by the officer to
> temper or to limit the amount of force; the severity of
> the security problem at issue; the threat reasonably
> perceived by the officer; and whether the plaintiff was
> actively resisting. See, e.g., Graham, 490 U.S. at 396.

Kingsley, 135 S. Ct. at 2473 (internal citations modified).

According to Plaintiff, on December 23, 2015, while housed in

disciplinary confinement, Plaintiff and other inmates were "throwing sh*t" at

each other, and they created an unsanitary and potentially dangerous

situation requiring biohazard cleanup. After the area was cleaned, Defendant

Wetherbee approached Plaintiff's cell, opened the food flap, and said something

to the effect of, "where is the sh*t bomb?" Although Plaintiff had a shampoo bottle and other cups filled with waste in his cell,[5] Plaintiff responded, in substance, "[W]hat sh*t bomb, man?"[6] Defendant Wetherbee then sprayed chemical agents into Plaintiff's cell through the food flap.

At the time the chemical agents were administered, Plaintiff was not standing at his cell door; rather, he was standing close to the toilet in his cell, but he claims the spray "[h]it [him] right in the face." Doc. 104-1 at 81, 83. Plaintiff was "blinded" by the chemical agents, but he heard Defendant Wetherbee direct that Plaintiff's cell door be opened. Id. at 83; see Doc. 21 at 3. According to Plaintiff, officers were yelling at him to get on the ground.

---

[5] Plaintiff testified that he had a shampoo bottle filled with waste and he further stated, "I probably had some cups in there, you know, to make my little mix . . . . I told you we had a little war - - a little war going on." Doc. 104-1 at 110-11.

[6] Plaintiff's allegations regarding this exchange vary among his Amended Complaint, deposition, and other filings. In the Amended Complaint, Plaintiff alleges: "Once Officer J. Whetherbee [sic] got to my cell he opened my food flap and stated, 'give me the sh*t the bomb.' Before I had a chance to explain myself or do anything, Officer J. Whetherbee [sic] had pulled out his pepper gas and sprayed me through my food flap." Doc. 21 at 3. At deposition, when describing what happened after Defendant Wetherbee asked him for the "sh*t bomb," Plaintiff stated: "Basically I asked him, like, what - - I basically played stupid. I'm like, what waste bomb. But before I could say anything else, he was - - he was spraying me." Doc. 104-1 at 80. In his Supplemental Brief, Plaintiff states, "Officer Wetherbee unlocked plaintiff food flap and stated, 'Where's the sh*t bomb,['] within second [sic] before plaintiff could bearly [sic] finish his sentence Wetherbee had OC sprayed him." Doc. 137 at 3-4.

Plaintiff lay on the ground, outside of his cell, and he was punched and kicked repeatedly. See Doc. 104-1 at 83-84; see Doc. 21 at 3. After Plaintiff was handcuffed, he was placed in a restraint chair. Within ten to thirty minutes of being placed in the restraint chair, a nurse examined Plaintiff and rinsed out his eyes. See Doc. 104-1 at 54.

### a. Defendant Wetherbee's Use of Chemical Agents

The Eleventh Circuit has recognized chemical agents as an acceptable non-lethal use of force so long as a valid penological reason supports such force. See Sconiers v. Lockhart, 946 F.3d 1256, 1264 (11th Cir. 2020); Thomas v. Bryant, 614 F.3d 1288, 1310-11 (11th Cir. 2010); Danley v. Allen, 540 F.3d 1298, 1306 (11th Cir. 2008), overruled on other grounds as recognized by Randall v. Scott, 610 F.3d 701, 709-10 (11th Cir. 2010). "Given that pepper spray ordinarily causes only temporary discomfort, it may be reasonably employed against potentially violent suspects, especially those suspects who have already assaulted another person and remain armed." McCormick v. City of Fort Lauderdale, 333 F.3d 1234, 1245 (11th Cir. 2003)

In this circumstance, Defendant Wetherbee was dealing with an unsanitary and unstable environment involving a potentially dangerous pretrial detainee. When Defendant Wetherbee administered the chemical agents, he knew Plaintiff was housed in disciplinary confinement and that

12

approximately one week earlier, Plaintiff had intentionally flooded his cell.[7] Defendant Wetherbee also knew that Plaintiff and other inmates had just been throwing "sh*t bombs" at each other in the dormitory.[8] And, when ordered to do so, Plaintiff did not immediately turn over the "sh*t bomb" supplies that were inside his cell. Thus, Defendant Wetherbee was entitled to use some force to gain Plaintiff's compliance.

Considering the factors outlined in Kingsley, the Court concludes that Defendant Wetherbee's use of chemical agents was objectively reasonable and thus did not violate Plaintiff's constitutional rights. The situation was "tense, uncertain, and rapidly evolving"; Plaintiff was a threat to others and was disobeying lawful commands to relinquish contraband;[9] the amount of force

---

[7] See Doc. 104-1 at 60-61 (Plaintiff testifying that approximately one week before the use of force at issue, he flooded his cell, and Defendants pulled him out of his cell and talked to him about it).

[8] Defendants submitted copies of Plaintiff's disciplinary history, but they did not submit any evidence showing that Defendants Wetherbee, Coulter, and Brabston knew of Plaintiff's disciplinary history. See Kingsley, 135 S. Ct. at 2473 ("A court must make this determination from the perspective of a reasonable officer on the scene, including what the officer knew at the time, not with the 20/20 vision of hindsight." (emphasis added)). Thus, the Court will not assume that Defendants knew of Plaintiff's disciplinary history.

[9] Plaintiff was aware that the "sh*t bomb" supplies were considered contraband. See Doc. 104-1 at 80.

used was minimal (one or two bursts);[10] and Defendants ensured Plaintiff received immediate medical care after they subdued him, and Plaintiff did not complain of lasting effects from the spray.[11]

Although Plaintiff quarrels with the timing of Defendant Wetherbee's deployment of the chemical agents,[12] he admits that he had contraband in his cell and did not turn it over when asked to do so. Defendant Wetherbee did not have to wait to be sprayed with human waste before deploying the chemical agents, nor did he have to convince Plaintiff to comply with his lawful command. See Danley, 540 F.3d at 1307 ("[P]rison guards do not have the luxury or obligation to convince every inmate that their orders are reasonable and well-thought out."). Accordingly, Plaintiff fails to show the violation of a constitutional right as to Defendant Wetherbee's use of chemical agents.

---

[10] Plaintiff agreed at deposition that he was sprayed one time, Doc. 104-1 at 80-81, but Defendant Wetherbee's narrative report indicates two one-second bursts of chemical agents were deployed into Plaintiff's cell, Doc. 112-12 at 5.

[11] Indeed, chemical agents are "designed to disable a suspect without causing permanent physical injury." Vinyard v. Wilson, 311 F.3d 1340, 1348 (11th Cir. 2002) (quotations and citations omitted).

[12] Plaintiff argues that Defendant Wetherbee violated the jail's policy on the use of chemical agents. However, a violation of such policies, without more, does not violate an inmate's constitutional rights. See Sandin v. Conner, 515 U.S. 472, 481-82 (1995) (recognizing that prison regulations are "not designed to confer rights on inmates").

Even if the Court were to conclude Defendant Wetherbee's use of chemical agents was objectively unreasonable, Plaintiff has not pointed to any clearly established law that would have placed Defendant Wetherbee on notice that the use of chemical agents in this situation arose to unconstitutional excessive force. Rather, Plaintiff cites to broad legal principles relating to excessive force. But these broad principles do not apply with "obvious clarity" to the specific situation facing Defendant Wetherbee. See Johnson v. Conway, 688 F. App'x 700, 706-07 (11th Cir. 2017) ("'[I]f a broad principle in case law is to establish clearly the law applicable to a specific set of facts facing a governmental official, it must do so with obvious clarity to the point that every objectively reasonable government official facing the circumstances would know that the official's conduct did violate federal law when the official acted.'" (quoting Vinyard v. Wilson, 311 F.3d 1340, 1351 (11th Cir. 2002)). Plaintiff has failed to show that Defendant Wetherbee's conduct "was so far beyond the hazy border between excessive and acceptable force that [he] had to know he was violating the Constitution even without caselaw on point." See id. (quoting Fils v. City of Aventura, 647 F.3d 1272, 1291 (11th Cir. 2011)).

Thus, considering the foregoing, the Court finds that Defendant Wetherbee is entitled to qualified immunity on Plaintiff's excessive force claim regarding the use of chemical agents. It follows that, to the extent Plaintiff

15

attempts to hold Defendants Coulter and Brabston liable for the chemical spraying, he cannot do so based on the Court's finding, as they did not administer the chemical agents and Defendant Wetherbee's use of chemical agents was not violative of Plaintiff's constitutional rights.

### b. Defendants' Use of Physical Force

Plaintiff alleges that Defendants Wetherbee, Coulter, and Brabston participated in the use of force outside of his cell after he was chemically sprayed. Defendants seek qualified immunity on this claim as well. "Because § 1983 'requires proof of an affirmative causal connection between the official's acts or omissions and the alleged constitutional deprivation,' each defendant is entitled to an independent qualified-immunity analysis as it relates to his or her actions and omissions." Alcocer v. Mills, 906 F.3d 944, 951 (11th Cir. 2018) (quoting Zatler v. Wainwright, 802 F.2d 397, 401 (11th Cir. 1986)).

Plaintiff alleges that Defendants Wetherbee, Coulter, and Brabston collectively used excessive force on him, see Doc. 21 at 2-3, but he does not know which officers were punching and/or kicking him, see Doc. 104-1 at 84-86, 98. The Eleventh Circuit has recognized "that a plaintiff is not required to specifically identify which particular officer used excessive force (and which officers failed to intervene) in order to overcome summary judgment." Hunter v. Leeds, City of, 941 F.3d 1265, 1282 n.19 (11th Cir. 2019). "Were this the law,

all that police officers would have to do to use excessive force on an arrestee without fear of consequence would be to put a bag over the arrestee's head and administer the beating in silence." Velazquez v. City of Hialeah, 484 F.3d 1340, 1342 (11th Cir. 2007); see also Alexandre v. Ortiz, 789 F. App'x 169, 176 (11th Cir. 2019). Because the evidence does not illuminate which Defendant or Defendants participated in the alleged kicking and punching or the extent of their participation in the alleged conduct, the Court is unable to individually analyze the actions of each Defendant. See Velazquez, 484 F.3d at 1342 (rejecting the defendants' argument that "because [the plaintiff] did not see who beat him, if anyone did, there would be no evidence at trial from which a jury might assign liability for the beating"). Instead, the Court's analysis applies equally to Defendants Wetherbee, Coulter, and Brabston.

Plaintiff alleges that he saw Defendants Wetherbee, Coulter, and Brabston, along with three or four other unidentified officers, "putting on black gloves, and heading out [of] the booth into the dorm where [he] was at." Doc. 21 at 2. Defendant Wetherbee approached Plaintiff's cell first, and the use of chemical agents occurred (discussed supra). Plaintiff was "blind" and "gasping for air." Id. at 3. Plaintiff continues,

> Once my cell door became open I heard all the Officers
> screaming, "get on the ground," "get on the ground."
> Therefore, I quickly complied with the officers['] order
> and got on the ground on my stomach. Once I lay on

17

the ground, I heard all the officers yelling, "stop resisting," "stop resisting," and as they [were] yelling this, they are all punching and kicking me in my face and rib cage. And before I knew it, one of them delivered the fatal blow with his handcuff[]s that knocked me unconscious.

Id. He then states that when he awoke, he was in the restraint chair, and Nurse Smith was washing out his eyes. Id.

At deposition, Plaintiff testified as to the placement of his hands when he was on the ground:

Q. Did you try to defend yourself at all?

A. No, sir.

Q. Did you try to block the punches or protect your face?

A. I did. I just basically just laid - - laid on the ground. You know, I thought - - I thought they were just - - I thought they were just going probably just handcuff me or - - that's why I got on - - that's why I got on the ground. I thought they were going probably just, like, handcuff me or something like that.

Q. When you were laying on the ground and the officers were punching and kicking you, where were your hands?

A. Um, that - - that right there - - that right there. It happened so fast - - that right there, I probably - - most likely, I probably had my hands

18

trying to - - trying to protect my face. But then, again,
I'm not - - I'm not for certain - - 100 percent certain.

Doc. 104-1 at 86. Plaintiff also testified at deposition that he was "not one
hundred percent sure" if he was knocked unconscious, but "it was pretty much,
like . . . a blackout." Id. at 88, 89. Further, Plaintiff testified that he could not
remember exactly when he was handcuffed, and he acknowledged that he
"can't refute" that the officers handcuffed him after their use of force. Id. at
155-56. He testified that the punching and kicking lasted about two or three
minutes. Id. at 87-88.

As a result of the force used, Plaintiff had a superficial laceration that
was 1.5 centimeters long on his ear. The laceration was treated with glue (not
stitches). See id. at 92-93. At deposition, he testified that he also had
"[s]oreness and bruises and stuff like that." Id. at 138, 140-41. He further
stated that he has "mental damage" in that "every time [he] see[s] the police,"
he feels like they are trying to harm him. Id. at 156.

Viewing the facts in the light most favorable to Plaintiff, as the Court
must, the Court finds Defendants are not entitled to qualified immunity as to
the alleged use of physical force. After Plaintiff was sprayed with chemical
agents, according to him, he complied with officers' commands by lying on his
stomach on the ground. Then, according to Plaintiff, Defendants kicked and
punched him repeatedly. Defendants argue that Plaintiff was non-compliant

because Defendant Wetherbee's "Response to Resistance Report," which Plaintiff filed, indicates Defendant Wetherbee ordered Plaintiff to submit to hand restraints several times before opening his cell door, see Doc. 112-12 at 5, and Plaintiff testified at deposition that his hands were "probably" by his face when he was lying on the floor, Doc. 104-1 at 86. Defendants did not submit any affidavits or declarations explaining their version of events, but they argue that Plaintiff "has never contended, and there is no evidence in the record that he was not ordered to be handcuffed." Doc. 134 at 5.

While some force may have been necessary to place Plaintiff in handcuffs, Plaintiff alleges the kicking and punching lasted for two to three minutes, during which time he remained face down on the floor with his hands maybe by his face, which suggests his hands were visible. "[I]f force used against a pretrial detainee is more severe than is necessary to subdue him or otherwise achieve a permissible governmental objective, it constitutes 'punishment' and is therefore unconstitutional." Piazza, 923 F.3d at 952. Even if a detainee is initially resisting, once he "'has stopped resisting there is no longer a need for force, so the use of force thereafter is disproportionate to the need.'" Id. at 953 (quoting Danley, 540 F.3d at 1309); see also Skrtich v. Thornton, 280 F.3d 1295, 1304 (11th Cir. 2002) ("The use of force must stop when the need for it to maintain or restore discipline no longer exists.").

20

Taking Plaintiff's version of the facts as true, there was no need for such force after he lay on the floor and was under the effects of chemical agents. This is so even if Defendants ordered Plaintiff to submit to handcuffs and Plaintiff's hands were by his face. A reasonable officer would not have perceived Plaintiff as a threat at that time, nor would a reasonable officer see Plaintiff as posing a security issue as there is no indication that Plaintiff was attempting to assault the officers while he was lying on the ground or that he was otherwise being aggressive toward the officers. While officers must make "split-second judgments" in "tense, uncertain, and rapidly evolving" situations, Piazza, 923 F.3d at 953, a reasonable officer in Defendants' positions would know it is not reasonable to repeatedly punch and kick an inmate while he is lying prone on the ground even for a few seconds, let alone up to three minutes.

Defendants argue that Plaintiff's allegations are not credible because his allegations and deposition testimony conflict and because he did not sustain injuries one would expect to have resulted from the conduct he describes. For instance, Defendants note that, in his Amended Complaint, Plaintiff alleged he was knocked unconscious and woke up when he was in the restraint chair with the nurse washing out his eyes, but at his deposition, he testified that he was walked down the stairs and placed in the restraint chair where he waited for the nurse. See Doc. 134 at 6-7. Additionally, Defendants argue Plaintiff's

assertion "that the 'punching and kicking' lasted 'two or three minutes'" cannot be believed because he "also said that he was 'knocked unconscious' 'before [he] knew it.'" Id. at 6. Finally, Defendants emphasize the only documented injury Plaintiff sustained was a superficial laceration that was 1.5 centimeters long on his ear, which was treated with glue (not stitches).[13] See id. at 7-9, 22-23.

"Even if [a plaintiff's] sworn statements turn out to be exaggerations or false, they are enough to raise a genuine issue of material fact." Sears v. Roberts, 922 F.3d 1199, 1209 (11th Cir. 2019). And a "plaintiff's testimony cannot be discounted on summary judgment unless it is blatantly contradicted by the record, blatantly inconsistent, or incredible as a matter of law, meaning that it relates to facts that could not have possibly been observed or events that are contrary to the laws of nature." Id. at 1208 (citation omitted). While "resulting injuries can be an indicator, however imperfect, of the severity of the force that caused them," the "lack of significant injury [does not] always and everywhere mean[] that the force used was reasonable." Crocker v. Beatty, 995

---

[13] Nurse Practitioner Win Tate testified that if someone was kicked and punched by several people, she would expect to see more injuries than Plaintiff had and would expect the person to be in pain. See Doc. 104-5 at 40-41. When asked if she would expect to see symptoms if someone was beaten for two to three minutes, she responded: "Well, it depends. I mean, if you're hitting lightly, then, no, but, if you're really punching - - and they can - - you know, then - - then I would expect to see, yeah, a lot." Id. at 41.

F.3d 1232, 1251, 1251 n.17 (11th Cir. 2021), petition for cert. docketed, No. 21-786 (U.S. Nov. 29, 2021).

Any potential discrepancies in Plaintiff's story may cause a fact finder to discredit his version of events, but it is not the province of the Court on summary judgment to weigh the evidence or make credibility determinations. See Sears, 922 F.3d at 1208-09; see also Rivera v. LeBron, 824 F. App'x 838, 842 (11th Cir. 2020) ("As a general rule, that kind of credibility determination is not appropriate at the summary judgment stage."). The medical records and discrepancies in Plaintiff's allegations are insufficient to wholly discredit his allegations. See Sears, 922 F.3d at 1208-09 (discussing "a big difference" between a video of an incident and documentary evidence consisting mainly of various forms of the defendants' testimony).[14]

---

[14] Defendants argue that Plaintiff "admitted that the allegations of the amended complaint, albeit 'verified,' were not truthful." Doc. 134 at 24 (citing Doc. 104-1 at 78, 91; Doc. 112 at 3). In the cited portion of his deposition, Plaintiff stated that he signed his Amended Complaint swearing that the allegations were true, and that he had told the truth thus far in his deposition testimony. Doc. 104-1 at 78. Later in the deposition, defense counsel attempted to get Plaintiff to admit that his allegations in the Amended Complaint on a particular point were not true. See id. at 91. Although not cited by Defendants, in seemingly referring to the allegations in his Amended Complaint, Plaintiff stated: "[E]verything is pretty much the truth." Id. at 92. In his summary judgment response, Plaintiff said he has not admitted that his allegations are not completed true. Doc. 112 at 3.

"When a party has given clear answers to unambiguous questions which negate the existence of any genuine issue of material fact [for summary judgment], that party cannot thereafter create such an issue with an affidavit

23

Plaintiff alleges that he lay on the ground in compliance with the officers' orders, and then the punching and kicking began. Simply because Plaintiff did not suffer significant injury does not render his allegations blatantly contradicted. On this record, an objectively reasonable officer would neither repeatedly punch and kick an inmate who was lying prone on the ground (even if his hands were near his face) nor watch other officers do so. While Defendants' account of what transpired that day may differ from Plaintiff's account,[15] on summary judgment, the Court must view the facts in the light most favorable to Plaintiff. On Plaintiff's facts, repeatedly kicking and punching an inmate who was lying face down on the ground in compliance with the officers' orders was objectively unreasonable.

Thus, the Court turns to whether the law was clearly established. At the time of the incident, the law regarding using force on a pretrial detainee was well-settled such that every reasonable officer would have known that

---

that merely contradicts, without explanation, previously given clear testimony." McCormick, 333 F.3d at 1240 n.7 (quotations and citation omitted). Even if this legal proposition applies to prior sworn statements, Plaintiff's deposition transcript is not as clear as Defendants argue, and the Court will not wholly discredit the allegations in the Amended Complaint.

[15] As previously noted, Defendants did not submit their own affidavits, but Plaintiff filed an incomplete copy of a "Response to Resistance Report" completed by Defendant Wetherbee. See Doc. 112-12. Defendant Wetherbee's factual narrative differs significantly from Plaintiff's allegations.

repeatedly kicking and punching a non-resistant inmate lying face down on the ground was objectively unreasonable. See Piazza, 923 F.3d at 953 ("[B]ecause force in the pretrial detainee context may be defensive or preventative—but never punitive—the continuing use of force is impermissible when a detainee is complying, has been forced to comply, or is clearly unable to comply."). Defendants had fair warning that their alleged conduct was objectively unreasonable. See id. at 955-56; Williams v. Burton, 943 F.2d 1572, 1576 (11th Cir. 1991) ("The basic legal principle is that once the necessity for the application of force ceases, any continued use of harmful force can be a violation of the Eighth and Fourteenth Amendments, and any abuse directed at the prisoner after he terminates his resistance to authority is an Eighth Amendment violation."); Robinson v. Lambert, 753 F. App'x 777, 782 (11th Cir. 2018) (citations omitted) (finding well established the law prohibiting an officer from continuing to use force when there is no longer a need for it such that the law applied with "obvious clarity" to the facts of the case before the Court).

Therefore, in light of the foregoing, it is

**ORDERED**:

1.      Defendants' request for qualified immunity on Plaintiff's excessive force claims is **GRANTED in part and DENIED in part**.

    a. The request is **GRANTED to the extent** that Defendants are entitled to qualified immunity with respect to the use of chemical agents. Judgment on that claim, as well as judgment on the claims adjudicated by the Court's prior Order (Doc. 117 at 24 ¶1.a.), is withheld pending adjudication of the remaining claims.

    b. Defendants' request for qualified immunity related to the alleged use of physical force is **DENIED**. This case will proceed on Plaintiff's excessive force claims against Defendants in their individual capacities with respect to the use of physical force.

2. Within **60 days** from the date of this Order, the parties shall confer in a good faith attempt to settle the remaining claims. If the parties are able to resolve the case without further Court intervention, they shall file the appropriate documents to close out the file. If the parties are unable to settle the case, they shall file a notice advising whether a settlement conference with a United States Magistrate Judge may be beneficial.

3.     Plaintiff's Motion for Court to Deny Defendants' Motion for Summary of Judgment (Doc. 140) is **DENIED as moot**.

**DONE AND ORDERED** at Jacksonville, Florida, this ___3rd___ day of _____January_____, 2022.

HARVEY E. SCHLESINGER
United States District Judge


JAX-3 12/23
c:
Carlton Xavier Mathews, #J27519
Sonya Harrell Hoener, Esquire
Sean Bryan Granat, Esquire

27